**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

BARBARA JEFFORDS, a/k/a Barbara
Lemley,

      Plaintiff,

v.                              Case No:   3:13-cv-286-J-32PDB

COLUMBIA COUNTY BOARD OF
COUNTY COMMISSIONERS,
RONALD WILLIAMS, individually,
and JODY DUPREE, individually,

      Defendants.

---

## O R D E R

      Barbara Jeffords claims that Columbia County Commissioners Jody Dupree and Ronald Williams retaliated against Jeffords for her exercise of her First Amendment rights of free speech and to petition the government. (Doc. 1). Jeffords has also sued the Columbia County Board of County Commissioners for Dupree and Williams' statements. (Doc. 1). Defendants moved for summary judgment (Doc. 19) and Plaintiff responded (Doc. 22, 23). The Court heard oral argument on October 20, 2014, and the transcript of that proceeding is incorporated herein. (Doc. 27).

I.    **FACTS**

    A.    **Jody Dupree**

      At the County Commissioner Board meeting on March 3, 2011, Jeffords spoke in opposition to the Board's appointment of Jack Berry to the Well Florida Council. (Doc. 23-1 at 4). Jeffords said,

> I'm opposed to Mr. Berry being . . . appointed to the Wellness Florida Board. He does not represent Columbia County in a good light. . . . [M]ost or a large number of people in Columbia County are intimidated by him, but he does not intimidate me. And I just think that it would be poor judgment for you as [a] Board to appoint him to that council.

(Doc. 23-14 at 7-8).

At some point after that meeting, one of Commissioner Dupree's neighbors told Jeffords that Dupree had an unfenced pool. (Doc. 23-1). Jeffords took a photograph of the pool and notified Stewart Lilker, the publisher of a website called the Columbia County Observer. (Doc. 23-1 at 4-5). On March 17, 2011, Lilker published an article calling Dupree's pool, "a back yard death trap", and suggesting that Dupree had engaged in "brazen evasion of the law". (Doc. 23-12 at 2). Lilker noted that Jeffords had contributed to the article. (Doc. 23-12 at 4).

Jeffords attempted to contact Dupree's ex-wife, allegedly out of concern that she might still own the property and might therefore be liable for the unfenced pool. (Doc. 23-1 at 5). However, Jeffords was never able to locate or communicate with her. (Doc. 23-1 at 5).

After the conclusion of public comments at the Board meeting on the night the article was published, Dupree gave a twenty-minute speech. (Doc. 23-14). The majority of this speech pertained to Lilker. (Doc. 23-14). However, Dupree also mentioned receiving a disturbing phone call from his ex-wife in which she informed him that a citizen of the community had said that "they" were going after Dupree and wanted dirt on him. (Doc. 23-14 at 6). The unnamed citizen was therefore giving Dupree's ex-wife a chance to get retribution against Dupree. (Doc. 23-14 at 6). Dupree stated that his

ex-wife was irate, and she held "this despicable individual" in contempt. (Doc. 23-14 at 6). Dupree later suggested that his ex-wife had a hard time believing "that anyone would think that she would even consider stooping" to the depths required to give up dirt on her ex-husband. (Doc. 23-14 at 22).

During the same speech, Dupree personally apologized to Jack Berry for Jeffords' comments at the prior meeting. (Doc. 23-14 at 7). He promised to ensure that no more "personal attacks" would be made at the Board meetings. (Doc. 23-14 at 7). In the process, he repeated Jeffords' words from the transcript of the prior proceeding and described them as "inflammatory", "despicable", and "a personal vendetta against Mr. Berry." (Doc. 23-14 at 7-8).

As an example of the kind of negativity and personal attacks he sought to discourage, Dupree went on to list some of Lilker's complaints about local governance, never once mentioning the article about his pool published earlier that day. (See Doc. 23-14 at 8-20). Dupree asserts that, as he recalls, he did not find out about the article until days after it was published, and therefore after the March 17 meeting. (Doc. 19-2 at 31, 47).

During his speech, Dupree did, however, tell Lilker and Jeffords,

> You two, I can promise you this: The respect I got for y'all is down there at the bottom. Do not ever come to me asking for any special consideration. It will not exist. I cannot believe that you, Barbara [Jeffords], have stooped to the level that you have [stooped]. I will make sure that every friend you got knows what you tried to do. There is no doubt about it.
>
> I remember the times you come to my house when you were going through personal issues, and we were nothing but a friend to you. That was it. Nobody talked about your personal stuff on the street. Nobody did anything to shame

> you or your sons, but apparently that same consideration is
> not good enough for the rest of us.

(Doc. 23-14 at 20-21).

In closing, Dupree promised once again that there would no longer be personal attacks at the meetings, and reassured those in attendance that they could come talk to the Board. (Doc. 23-14 at 21). Dupree then concluded his remarks to applause. (Doc. 23-13 at 38:50).

### B.    Ronald Williams

In 2010, Jeffords supported Lilker's campaign for County Commissioner. (Doc. 23-1 at 3). In August 2010, after Lilker's defeat, a gravestone bearing Lilker's name, as well as Jeffords' name and the name of another Lilker supporter, was placed on the courthouse steps with cow manure. (Doc. 23-1 at 3). While it was apparently tradition to "bury" unsuccessful candidates, Jeffords took exception to this episode because, unlike previous burials, it was performed at the courthouse, rather than at election headquarters, occurred after the primary, rather than after the general election, and included the names of supporters, rather than just the name of the candidate. (Doc. 23-1 at 3).

Both Jeffords and Lilker complained to the police department. (Doc. 23-1 at 3). Lilker requested and received a copy of the courthouse security camera videos to investigate the incident. (Doc. 23-1 at 3). In the videos, Jeffords said that she could see Williams' truck, Dupree's vehicle, and County Commissioner Weaver. (Doc. 23-1 at 3-4). Nevertheless the state attorney, Skip Jarvis, refused to further investigate the incident, and said that the video was too dark to identify the individuals involved.

(Doc. 23-1 at 4). Williams now admits that he and Dupree, along with others, created the mock grave. (Doc. 23-3 at 4-5). He denies, however, that the burial was not in accordance with tradition, as he asserts that the graves were always placed in front of the courthouse and always included the names of the candidates' supporters. (Doc. 23-3 at 5-6).

More than half a year later, on some date between March 10 and April 7, 2011 (Doc. 19-1 at 16), Jeffords photographed the rear and sides of Williams' truck before a Board meeting. (Doc. 23-1 at 4). On April 21, 2011, at another Board meeting, Williams requested that the meeting be reconvened after it had already been adjourned. (Doc. 23-1 at 6). Then, he stated that, at the last scheduled meeting, Jeffords "took the effort on herself to plunder around [his] truck, lookin' . . . in the tailgate and takin' pictures of [his] truck". (Doc. 23-17 at 3). Williams asserted that he did not trust Jeffords, because he believed that anyone who would contact a Board member's ex-wife "to try to dig up dirt, would do anything." (Doc. 23-17 at 3). Williams promised that he would be filing an incident report with the sheriff, for fear that Jeffords might plant drugs or explosives on his truck. (Doc. 23-17 at 3). He then finished his statement and the meeting by stating that, "[I]f I get blown up – you all know what's goin' on. Okay?" (Doc. 23-16 at 2:08:14).

Jeffords did not attend the next meeting after the April 21, 2011 meeting, but has otherwise continued to be a regular attendee at the meetings, where she speaks on occasion. (Doc. 19-1 at 20).[1] As a result of her experiences at the meetings, she

---

[1] In her affidavit, Jeffords asserts that she "stopped attending Board meetings

believes that "there probably has been" someone who has avoided speaking at a board meeting. (Doc. 19-1 at 21). Jeffords herself was unable to fall asleep for several months after the incidents, although that problem is now somewhat resolved. (Doc. 19-1 at 22-23).

## II.    LAW

Jeffords' complaint contains two counts, one against the Columbia County Board of County Commissioners, and one against Williams and Dupree, each asserting that she was the victim of retaliation for engaging in constitutionally protected speech. (Doc. 1 at 4-8).

Defendants seek summary judgment, contending that Jeffords has failed to establish the requisite elements for a First Amendment retaliation claim. (Doc. 19 at 8). Relatedly, Defendants Williams and Dupree seek summary judgment on the grounds that they have qualified immunity.[2] A First Amendment retaliation claim requires that a plaintiff have engaged in constitutionally protected speech, that the defendant engaged in retaliatory conduct that adversely affected that speech, and that

---

regularly for a period of time" after Dupree's and Williams' statements. (Doc. 23-1 at 7). In her deposition testimony, Jeffords asserts that she skipped a meeting after Williams' comments, but has otherwise continued to be a regular attendee at Board meetings. (Doc. 19-1 at 20). Reconciling this testimony, it appears that the "period of time" for which she stopped attending Board meetings was one meeting.

[2] Each Defendant has a separate, additional ground on which they seek summary judgment. Dupree asserts that he has absolute legislative immunity, (Doc. 19 at 18-21), Williams asserts that he was not acting under color of state law, (Doc. 19 at 7-8), and the Board asserts that any constitutional violation was not the result of County custom or policy (Doc. 19 at 21-23). The Court need not reach these additional grounds.

the retaliatory conduct and adverse effect were causally connected. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). An adverse effect occurs where "the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Bennett, 423 F.3d at 1254 (11th Cir. 2005). Although this is an objective standard, whether the plaintiff herself was deterred can be evidence of whether a reasonable person would be deterred. Id. at 1255.

Where there are consequences for the plaintiff's speech, those consequences need not be great to deter a person of ordinary firmness. Moon v. Brown, 939 F. Supp. 2d 1329, 1349 (M.D. Ga. 2013) (finding that a person of ordinary firmness would be deterred by having their truck towed, with an expense of $90). However, to adversely affect speech, retaliatory conduct must constitute more than a mere inconvenience to the plaintiff's exercise of her First Amendment rights. Bethel v. Town of Loxley, 221 F. App'x 812, 813 (11th Cir. 2006). Thus, where public officials merely express distaste for a plaintiff's speech, without threats of violence or other consequences, a person of ordinary firmness would not be deterred. See Woods v. Valentino, 511 F. Supp. 2d 1263, 1283 (M.D. Fla. 2007). Similarly, comments that are offensive, unprofessional, and inappropriate would not necessarily deter a person of ordinary firmness, even where they cause embarrassment, humiliation, and emotional distress. Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir. 2002).

Context is important in determining whether retaliatory conduct would deter a person of ordinary firmness. Bennett, 423 F.3d at 1252. In Naucke, the plaintiff

asserted that the defendants retaliated against her free speech right by, amongst other things, scolding her at city council meetings and publicly calling her names. <u>Naucke</u>, 284 F.3d at 927. While these comments were certainly inappropriate, they were not sufficient to deter a person of ordinary firmness, especially in light of the fact that the plaintiff continued to speak out against the city council. <u>Id.</u> at 928.

### 1.   **Dupree**

Jeffords asserts, and Defendants do not dispute, that she was engaged in constitutionally protected speech both when she spoke about her opposition to Berry's appointment and when she took photographs of Dupree's pool. (Doc. 22 at 12).[3] She argues that Dupree's speech at the March 17 Board meeting constituted adverse action. (Doc. 22 at 13-14). As evidence that the speech was causally connected to her participation in Lilker's article about Dupree's pool, Jeffords points to the indeterminacy in the record as to whether Dupree read the article before making his speech, as well as that Dupree referenced a call from his ex-wife during the speech, which was given near the time that Jeffords was trying to reach his ex-wife about the pool. (Doc. 22 at 14-15). Jeffords also alleges a causal connection to her speech regarding Berry because Dupree apologized to Berry for Jeffords' words. (Doc. 22 at 15).

Jeffords' claim against Dupree fails because, as a matter of law, Dupree's remarks at the March 17 Board meeting did not adversely affect Jeffords' speech. As

---

[3] If it was disputed, the Court would have to consider whether taking the photographs of the pool (as opposed to writing or speaking about it) constitutes protected First Amendment speech.

agreed to by Defendants, words alone may in some cases be sufficient to deter a person of ordinary firmness. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1268-69 (11th Cir. 2004) (holding that a teacher's verbal censure of a student in front of his classmates had a "tremendous chilling effect on the exercise of First Amendment rights"). The Court can envision a case where the words of an elected official, in a public meeting and delivered with the imprimatur of the official's office, are so powerful or demeaning that they could deter a person of ordinary firmness from engaging in future First Amendment speech. This, however, is not that case.[4]

While not decisive, Jeffords' own conduct provides some evidence that a person of ordinary firmness would not be deterred. Bennett, 423 F.3d at 1255. It is undisputed that she continued to go to meetings after Dupree's speech, as she was in attendance at the April 21 meeting where Williams allegedly retaliated against her. Moreover, Jeffords still speaks at meetings when she has an opinion. (Doc. 23-1 at 2).

Most persuasive to the Court, however, is the unthreatening nature of the allegedly retaliatory conduct. Dupree expressed distaste for Jeffords' speech about Berry. (Doc. 23-14). He was also clearly unhappy about any attempts she may have made to speak to his ex-wife. (Doc. 23-14 at 20-21). However, he did not make any threats against Jeffords, nor did he list any potential consequence resulting from his anger at her, except that she would not be eligible for any "special consideration" from

---

[4] This case does not require the Court to determine in what circumstances speech by a public official is itself protected by the First Amendment and how that might affect a First Amendment retaliation case premised on speech by that public official.

him. (Doc. 23-14 at 20-21). No reasonable person would be deterred by this potential loss of "special consideration". See Woods, 511 F. Supp. 2d at 1283. Nor would a person of ordinary firmness be deterred by Dupree's other comments. While Dupree's referencing of personal issues in a Board meeting and his criticism of Jeffords for making a "personal attack" by exercising her right to speak against Berry's nomination seem intemperate conduct for an elected public official, as a matter of law, they do not rise to the level of First Amendment retaliation on these undisputed facts.

### 2.   **Williams**

Jeffords argues that the pictures she took of Williams' vehicle were protected speech, that Williams' comments at the end of the April 21 meeting constituted a retaliatory act that adversely affected her speech, and that the speech and retaliatory action were causally connected. (Doc. 22 at 15-16).[5] Even assuming arguendo that Jeffords engaged in protected speech when she photographed Williams' truck (a dubious proposition at best), Jeffords' claim fails because she has not provided evidence of a retaliatory action that would adversely affect an "ordinary person's" speech.

Though not conclusive, the absence of evidence that Jeffords was personally deterred from taking future photographs provides some evidence that a person of ordinary firmness would not be deterred by Williams' response. Indeed, the only evidence of deterrence that Jeffords offers is that she missed one Board meeting, before

---

[5] Jeffords does not contend that Williams' and Dupree's participation in the sophomoric mock grave incident was in retaliation for her protected speech.

returning to regular attendance at meetings, where she continued to speak. (Doc. 23-1 at 2).

Williams' comments suggesting that he would not put it past Jeffords to plant drugs or explosives in his car were inflammatory and seemingly overwrought. (Doc. 23-17 at 3). However, his only threat was that he would file a police report about the incident, which he never did. (Doc. 23-17 at 3; Doc. 19-3 at 17). Even if he had, Jeffords had no reason to fear such a report so long as she continued to operate within the bounds of the law in taking pictures. The Court has no doubt that anyone in Jeffords' shoes would dislike and be offended by Williams' speech. It was also ill-conceived for Williams to reconvene the Board meeting to use the platform of an official governmental proceeding just for the purpose of calling out Jeffords and venting his anger toward her. Nevertheless, on these facts, Williams' speech did not constitute First Amendment retaliation; it was insufficient to deter a person of ordinary firmness from engaging in protected speech.[6]

### 3.   __The Board__

In the absence of any underlying First Amendment retaliation, there is no act for which the Board can be held liable.

---

[6] Because the Court has determined on these facts that Plaintiff has not established a First Amendment violation, the Court need not address the remaining aspect of qualified immunity: whether the alleged violation was contrary to clearly established law. See Pearson v. Callahan, 555 U.S. 223, 232 (2009).

## III.   CONCLUSION

The First Amendment protects both the "freedom of speech" and "the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. These are important, fundamental rights. A citizen who addresses a local governmental body, such as the Columbia County Board of County Commissioners, on matters of public concern, should be able to do so free of adverse consequences from the Board or its members. If a future case is of more substance and less soap opera than this one, the Court will not hesitate to render local elected officials liable for conduct that chills a citizen's First Amendment right to petition her government.

Accordingly, it is hereby

**ORDERED:**

1.   Defendants' Motion for Summary Judgment (Doc. 19) is **GRANTED**.

2.   The Clerk should enter judgment in favor of Defendants Columbia County Board of County Commissioners, Ronald Williams, and Jody Dupree, and against Plaintiff Barbara Jeffords, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 12th day of November, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

w.
Copies to:

Counsel of record